**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.  5:11CR393 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | OPINION & ORDER |
| | ) | |
| | ) | |
| BRIAN P. HORTON, | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court is the motion of the government to forcibly medicate defendant Brian Horton for the purpose of restoring him to competency. (Doc. No. 66.) A hearing was held on the motion on January 3, 2013, which was continued to April 10, 2013, upon defendant's request to obtain an independent psychiatric evaluation. On April 11, 2013, the Sixth Circuit issued a decision on the subject of forced medication in *United States v. Grigsby*, No. 11-3736, 2013 WL 1458009 (6th Cir. 2013) (recommended for full text publication). The Court afforded the parties leave to brief the question of the impact of the decision in *Grigsby* on the government's motion. (*See* Doc. Nos. 81, 82.) Having carefully considered the medical reports submitted by the government, as well as the testimony and arguments offered at the hearings, and for the reasons that follow, the Court grants the government's motion.

**BACKGROUND**

On August 18, 2011, defendant was charged on a criminal complaint with one count of transmitting a threatening communication, in violation of 18 U.S.C. §

876(c). (*See* Doc. No. 1, Complaint; Doc. No. 12, Indictment, filed August 31, 2011.) In an affidavit attached to the complaint, it is alleged that on June 7, 2011, defendant contacted the chambers of a Florida state judge, and requested a "record" of the probate proceedings involving his late mother's estate. When he was advised that no such record could be transmitted, defendant became upset and threatened that if anything were to happen to his sister and an attorney—who were a party and counsel, respectively, in the probate matter—it would be the state court's fault. On June 14, 2011, the state court judge's chambers received a letter, sent through the U.S. Mails, from defendant wherein he allegedly wrote:

> I should have said I want to kill Both [sic] of them in cold blood . . . [and] I have exhausted all avenues in FL. Your office knows that what I am saying is true. Vigilante I will be. If I have a jury of my peers I want them to spare my life because I tried the legal system in Florida and it failed to up hold [sic] the laws of the land of FL. Maybe this will get a criminal hearing if I take the law into my own hands.

(Doc. No. 1-1, Affidavit at 3.)[1]

Defendant was arrested on August 18, 2011, and was released on bond on August 19, 2011. Defendant was arrested, again, on August 26, 2011, pursuant to a warrant for an alleged violation of his release conditions. Following a hearing on August 30, 2011, the Magistrate Judge issued an order of detention, finding that defendant had violated the conditions of his release. (Doc. No. 11, Order.) Specifically, the Magistrate Judge determined that on August 4, 2011, defendant sent an email to a congressman's office, threatening to murder an attorney in Canton, Ohio. The Magistrate Judge also

---

[1] All record page citations are to the page identification number generated by the Court's electronic docketing system.

2

found that defendant had failed to document the disposition of a firearm he possessed in his residence as ordered by U.S. Pretrial Services, noting that defendant's 1993 Wyoming conviction for family violence/battery prohibited him from possessing a firearm. (*See id.*)

On September 2, 2011, the government and the defendant filed a joint motion for a court-ordered competency examination and competency hearing. (Doc. No. 13, Joint Motion.) The Court granted the motion, finding reasonable cause to believe that "defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to adequately prepare a defense or otherwise assist properly in his defense." (Doc. No. 15, Order at 35-6.)

Defendant was transferred to the Federal Medical Center at Devens, Massachusetts (FMC Devens), for the purpose of submitting to a forensic mental health evaluation. In a report, dated February 6, 2012, a forensic psychologist diagnosed defendant with delusional disorder, persecutory type, and concluded that defendant was currently incompetent to stand trial on the present indictment. (Doc. No. 37, February 6, 2012 Report at 111-13.) It was further recommended that defendant be committed for evaluation and treatment for restoration of competency, pursuant to 18 U.S.C. § 4241(d).[2] (*Id.* at 112.) On February 13, 2012, the Court conducted a competency hearing. At the conclusion of the hearing, the Court found that defendant was not competent to stand trial, and ordered that he be returned to a suitable medical facility for the purpose of

---

[2] The author of the report, Forensic Psychologist Shawn Channell, noted that, "Mr. Horton has no insight into his illness and is opposed to the idea of taking medication. As a result, involuntary treatment with medication may need to be pursued in order to restore him to competency." (*Id.* at 113.) The parties stipulated to all of the findings contained in the report. (*See* Minutes, dated February 13, 2012.)

evaluation and restorative treatment. (*See* Minutes, February 13, 2012; Doc. Nos. 41 and 47, Orders for Competency Treatment and Insanity Evaluation.)[3]

Following a period of evaluation at the Federal Medical Center in Butner, North Carolina (FMC Butner), a report was generated detailing the efforts of FMC Butner's medical staff to properly evaluate defendant for possible restorative treatment and a determination of insanity at the time of the offense. (Doc. No. 53, July 31, 2012 Report.)[4] Given defendant's history of heart disease,[5] medical officials at FMC Butner reviewed medical records from defendant's private treating cardiologist, and scheduled a consultation with a consulting cardiologist for the purpose of determining whether restorative treatment would pose a risk to defendant's cardiac health. A cardiolite stress test was performed, and the results were still pending at the time the report was prepared. (July 31, 2012 Report at 149-150.) Defendant otherwise refused to participate in the evaluation process by either submitting to interviews, or accepting treatment with antipsychotic medication. (July 31, 2012 Report at 153.) The July 31, 2012 Report concluded that, given defendant's refusal to participate in the evaluation process, it was impossible to determine either his sanity at the time of the offense or the likelihood that restorative treatment would render him competent to proceed in the present case, and that additional time was necessary to make these determinations. Though afforded an

---

[3] On February 15, 2012, the government moved, pursuant to 18 U.S.C. § 4242(a), for a psychiatric examination of defendant, noting that defendant had provided notice pursuant to Fed. R. Crim. P. 12.2 that he intended to assert a defense of insanity at the time of the alleged offense. The Court subsequently ordered that the evaluation period address both restorative treatment and the viability of an insanity defense. (*See* Doc. No. 41.)

[4] The July 31, 2012 Report was authored by Keidy Ding, a pre-doctoral psychology intern. Ding's work was supervised by Robert Cochrane, Psy. D, and Byron Herbel, M.D. (July 31, 2012 Report at 155.)

[5] At the January 3, 2012 hearing, Dr. Cochrane testified that the medical records revealed that defendant had a past catherization and had undergone surgery on two occasions for the placement of stents.

opportunity to do so, neither party filed objections to the report. The Court, therefore, extended the evaluation period by 120 days. (Doc. No. 54, Order.)

Upon completion of FMC Butner's evaluation, a second report was produced, authored by Dr. Robert Cochrane, Psy. D. and Dr. Byron Herbel, M.D. (Doc. No. 64, November 16, 2012 Report, admitted without objection at the January 3, 2013 motion hearing as Government's Exhibit 1.) While defendant continued to refuse to participate in tests or discussions regarding his heart condition, the consulting cardiologist was able to make a determination that restorative treatment with antipsychotic medication would not pose a risk to defendant's cardiac health.[6] Additionally, consistent with the evaluation at FMC Devens, Drs. Cochrane and Herbel opined that defendant currently suffers from delusional disorder, persecutory type, that he is presently incompetent to stand trial, and that his condition is not likely to improve unless he is treated with psychotropic medications.[7] Because defendant remains resistant to the use of such medications, officials believe that judicial intervention to compel such treatment is necessary. The November 16, 2012 Report also outlines a detailed treatment plan that would be followed in the event that the Court intervened. The treatment plan included the medications—and their dosages—that health officials will administer, the

---

[6] At the hearing on January 3, 2013, Dr. Cochrane testified that, in addition to the cardiolite stress test, laboratory tests were performed, blood samples were taken and evaluated, and a physical examination of defendant was conducted.

[7] Defendant was also diagnosed with hypertension, hyperlipidemia, non-insulin dependent diabetes mellitus, recent bursitis in right shoulder and coronary artery disease with past cardiac catherization and stent placement. The Report also noted that defendant exhibited some traits of antisocial personality disorder, but that there was insufficient data to determine whether defendant met the full criteria for an antisocial personality disorder. (November 16, 2012 Report at 197.)

monitoring process for these medications, and measures that will be taken in the event that side effects are observed.

Following the submission of the November 16, 2012 Report, the government filed the present motion. Citing *Sell v. United States*, 539 U.S. 166, 123 S. Ct. 2174 (2003), and its progeny, the government now seeks an order requiring defendant to be forcibly medicated in order to restore him to competency pursuant to the Court's authority under 18 U.S.C. § 4241(d)(2)(A).

By agreement of the parties, Dr. Cochrane testified at both the January 3, 2013 hearing and the April 10, 2013 hearing via video conferencing. According to Dr. Cochrane, treatment with antipsychotic medication is substantially likely to render defendant competent to stand trial, other forms of treatment are unlikely to yield such results, and the use of antipsychotic medication is medically appropriate and unlikely to interfere with any pre-existing medical conditions or with defendant's ability to assist in the preparation of his defense.

At the beginning of the January 3, 2013 hearing, defendant requested that he be excused from the proceedings. The Court denied the request, finding that defendant was not competent to waive his presence, and attempted to impress upon defendant the importance of his participation in the process. During the hearing, defendant exhibited moments of bizarre and uncontrolled behavior, including disruptive outbursts.[8] He also accused his appointed counsel of colluding with medical professionals at FMC Butner,

---

[8] Defendant interrupted the testimony of Dr. Cochrane on multiple occasions, posing his own questions to Dr. Cochrane and the hearing participants at large. He also voiced the belief that the Court had already ruled on the question of forcible medication, and further suggested that the Court's actions were tantamount to a death sentence. The Court attempted numerous times to assure defendant that no decision had been made on the government's motion, and that it was imperative that he participate in the proceedings.

and stealing his cat. After numerous interruptions by defendant—usually followed by a request by defendant to be excused—the Court ultimately relented, and reluctantly excused him from the proceedings, determining that defendant's continued presence was unduly interfering with the hearing.[9] The Court arranged for defendant to view the proceedings from a live feed into the holding cell, and the Court took several breaks to permit defense counsel an opportunity to consult with his client.

After one such recess, defense counsel reported that defendant wished to engage a private medical consultant for the purpose of performing an independent evaluation. The Court indicated that it would grant the motion, and suspended the hearing until such time as the independent assessment could be performed. On January 15, 2013, the Court granted defendant's written request to employ the services Dr. Douglas Darnell to conduct the independent evaluation, and approved the funds necessary to complete the assessment. (January 15, 2013 Non-document Order.)

A continuation of the motion hearing was held on April 10, 2013. The hearing was originally scheduled for April 11, 2013, but the Court moved up the date out of concern for defendant's continued health and well-being after the United States Marshal's Office reported that defendant was participating in a hunger strike.[10] At the

---

[9] The Court observed that the continuous interruptions were interfering with the ability of the Court and counsel to follow the complicated medical testimony that was being presented. The witness also indicated that he was experiencing difficulty answering the government's questions in a coherent fashion.

[10] Defendant's multiple-day hunger strike was monitored in accordance with Bureau of Prisons regulations, 28 C.F.R. §§ 549.60-549.65. In connection with his hunger strike, defendant submitted a letter to the Court wherein he questioned the validity of the present indictment and indicated that he hoped that he would "have a massive heart attack or stroke" before the April 10, 2013 hearing. He further warned that if the Court did not release him, the jail would have a "dead body with no indictment." (Doc. No. 78, Letter at 262.) While defendant has been presented with a certified copy of the indictment in this case, he continues to maintain that he is being held without an indictment. (*See* Doc. No. 79, Confirmation of Execution of Order Requiring Service of Certified Copy of Indictment.)

7

April 10, 2013 hearing, the defense did not call any witnesses, or offer any exhibits.[11] In particular, the defense did not call Dr. Darnell as a witness, and did seek to introduce into evidence any report prepared by Dr. Darnell addressing the question of forced medication.[12] At the conclusion of the hearing, the Court took the government's motion under advisement.

LAW AND ANALYSIS

This Court recognizes that there exists a constitutionally protected liberty interest in rejecting unwanted medical treatment. *See Washington v. Harper*, 494 U.S. 210, 211 (1990). However, in *Sell,* the Supreme Court held:

> the Constitution permits the Government involuntarily to administer anti-psychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

539 U.S. 166, 123 S. Ct. at 2184-85.

This standard implies the following factors: (1) the existence of an "important" governmental interest; (2) that involuntary medication will "significantly further" the government interest; (3) that involuntary medication is "necessary" to further those interests; and (4) that the administration of the drugs is "medically appropriate" for

---

[11] As was the case with the January 3, 2013 hearing, the Court found it necessary to remove defendant from the courtroom because of his obstreperous behavior. Once again, defendant was permitted to view the proceedings from a live audio and visual feed into the holding cell.
[12] While not offered as an exhibit at the motion hearing, the Court permitted defense counsel to file under seal—in the Court's physical vault—a letter report prepared by Dr. Darnell.

the individual defendant. *Id*. at 2185.[13] The government bears the burden of proving each

of these factors by clear and convincing evidence. *United States v. Payne*, 539 F.3d 505,

508-09 (6th Cir. 2008) ("To the extent any question remains about the applicable

standard, we reaffirm that 'the risk of error and possible harm involved in deciding

whether to forcibly medicate' for the purpose of restoring competency are 'so substantial

as to require the government to prove its case by clear and convincing evidence.'")

(quoting *United States v. Brandon*, 158 F.3d 947, 961 (6th Cir. 1998)); *see United States*

*v. Green*, 532 F.3d 538, 545 n.6 (6th Cir. 2008).

       The Sixth Circuit recently addressed the application of the *Sell* factors in

*Grigsby*. There, the government sought an order to forcibly medicate a defendant, who

had been charged with unarmed robbery and had been deemed incompetent to stand trial

following a diagnosis of paranoid schizophrenia. The court found that the government

had not discharged its considerable burden under *Sell* of demonstrating that the case was

"sufficiently exceptional" to warrant the drastic measure of forcing medication upon an

unwilling pretrial detainee. *Grigsby*, 2013 WL 1458009, at *12. In reaching this

conclusion, the court relied upon evidence that the defendant was a likely candidate for

---

[13] In *Sell*, the Supreme Court urged courts to consider whether forced medication is "warranted for a *different* purpose . . . *before* turning to the trial competence question." *Sell*, 539 U.S. 166, 123 S. Ct. at 2185 (emphasis in original). The November 16, 2012 Report finds, consistent with Dr. Cochrane's testimony at the January 3, 2013 hearing and the April 10, 2013 hearing, that defendant does not meet the criteria for involuntary treatment under *Washington v. Harper*, as defendant does not pose a serious risk of dangerousness to himself or others. *See Washington*, 494 U.S. at 225-26. (November 16, 2012 Report at 200.) At the April 10, 2013 hearing, Dr. Cochrane explained that defendant's recent hunger strike did not necessarily render defendant a danger to himself. While Dr. Cochrane conceded that a hunger strike could theoretically pose a threat to a person's health, he opined that defendant's health was not presently in any danger. Additionally, Dr. Cochrane testified at the hearing that, while the course of treatment indicated here is medically appropriate for defendant, a failure to treat him with psychotropic drugs would not otherwise put defendant's health gravely at risk. *See generally Sell*, 539 U.S. 166, 123 S. Ct. at 2185. Therefore, the Court concludes that, if forced treatment with psychotropic medications is appropriate, it must be so that defendant may be returned to competency.

the insanity defense, and that he "may face a lengthy civil commitment due to his mental illness[,]" either following an insanity verdict—under 18 U.S.C. § 4243, or upon a determination that he was a danger to others or property—under 18 U.S.C. § 4246. *Id.* at *5. The court also found significant the fact that the defendant was likely to experience side effects from the antipsychotic medications that would interfere with his ability to assist in his own defense. *Id.* at *11.

In so ruling, the court emphasized that analysis of the *Sell* factors requires "[a] fact-intensive inquiry into the circumstances of each defendant[.]" *Grigsby*, 2013 WL 1458009, at *12. It was upon such an inquiry that the court concluded that "special circumstances unique to this case" compelled a finding that "Grigsby's liberty interest in avoiding involuntary medication outweigh[ed] the government's interest in prosecution[.]" *Id.* at *1. While this Court finds the decision in *Grigsby* both binding as to the law, and instructive as to the application of record facts to the governing law, it concludes that facts unique to *this* defendant require a different result. In particular (and as set forth below), the Court observes that there is no evidence that defendant would be a candidate for the insanity defense or involuntary commitment under § 4243 or § 4246, and the record evidence suggests that forced medication will actually improve defendant's ability to assist in his defense.

### 1.  "Important" Government Interest

The first prong of the *Sell* test requires trial courts to "find that *important* governmental interests are at stake." *Sell*, 539 U.S. 166, 123 S. Ct. at 2185 (emphasis in original). "The Government's interest in bringing to trial an individual accused of a serious crime is important." *Id.* "Whether a crime is 'serious' should be determined by its

maximum statutory penalty." *Green*, 532 F.3d at 549. The Sixth Circuit has instructed that the "maximum statutory period is the most objective means of determining the seriousness of a crime . . . because it reveals the legislature's judgment about the offense's severity." *Id.*

In this case, defendant is charged with one count of mailing a threatening communication. By statute, a conviction under 18 U.S.C. § 876(c) subjects the offender to a maximum penalty term of five years imprisonment. Courts have found similar conduct, punishable by at least five years in prison, to be serious offenses. *See, e.g., United States v. Nicklas*, 623 F.3d 1175, 1178 (8th Cir. 2010) ("transmitting a threatening communication in interstate commerce 'is certainly a serious offense'") (quoting the district court decision at 2009 WL 3872140, at *5 (W.D. Ark. Nov. 18, 2009)); *United States v. Feretti*, Civil Action No. 1:08-m-51, 2009 WL 4730227, at *3 (N.D.N.Y. Dec. 2, 2009) (crime of threatening a president, a former president, or the immediate family of the president, which carries a five-year penalty, was a serious offense); *United States v. Orlofsky*, 554 F. Supp. 2d 4, 5 (D.D.C. 2008) (finding a serious offense where the defendant was charged with threatening to use chemical weapons in violation of 18 U.S.C. § 1038, which carries a five-year maximum sentence); *see also United States v. Palmer*, 507 F.3d 300 (noting that courts have held that "crimes authorizing punishments of over six months are 'serious'").[14]

---

[14] At least one district court residing within the jurisdiction of the Sixth Circuit has found a crime carrying a maximum penalty of 2 years to be a serious crime. *See United States v. Miller*, No. 11-mj-30363, 2014 WL 866460, at *3 (E.D. Mich. Mar. 7, 2013) (crime of possessing a dangerous weapon, in violation of 18 U.S.C. § 930(e)(1), constituted a serious offense under *Sell*). Moreover, the Supreme Court has previously used a potential six-month sentence as the dividing line between petty and serious crimes. *See*, *e.g*., *Baldwin v. New York*, 399 U.S. 66, 71 (1970) (holding that a right to a jury trial existed in "serious" offenses punishable by incarceration of at least six months).

The nature of the charged offense, itself, also supports a finding that it is a serious offense. *See Green*, 523 F.3d at 550. Defendant is charged with threatening to kill two individuals associated with his mother's probate action. In connection with the present charge, defendant has purportedly refused to surrender a weapon registered to him, and has allegedly used the wires to communicate a second threatening communication. *See*, *e.g.*, *United States v. Johnson*, Case No. CR 06-1037, 2007 WL 1455756, at *4 (N.D. Iowa May 17, 2007) (relying, in part, on defendant's criminal past—including the fact that defendant "has made threatening remarks in the past"—in finding the existence of an important governmental interest).

The Court finds that the government has demonstrated by clear and convincing evidence the existence of an important government interest at stake in prosecuting defendant in this case. The Court in *Sell* recognized, however, that "[s]pecial circumstances may lessen the importance of [the Government's interest in prosecution]." *Sell*, 539 U.S. 166, 123 S. Ct. at 2185. Among the circumstances that could diminish the government's interest in prosecuting a serious offense are the length of time an individual has already spent in pre-trial confinement, the likelihood that the individual could be found not guilty by reason of insanity, and the possibility of civil commitment if the individual is not restored to competency. *See Green*, 532 F.3d at 551 (citing *Sell*, 123 S. Ct. at 2185); *United States v. Sheets*, No. 3:07-CR-68, 2008 WL 614330, at *2-*4 (E.D. Tenn. Oct. 15, 2008) (noting little value in prosecuting an offense to a "not guilty by reason of insanity" verdict) (citing *United States v. Evans*, 293 F. Supp. 2d 668, 675 (W.D. Va. 2003)).

In *Grigsby*, the Sixth Circuit found "significant evidence" that the defendant "may face a lengthy civil commitment due to his mental illness." 2013 WL 1458009, at *5. Specifically, the court noted that there were conflicting expert opinions offered on the question of whether the defendant would likely be found not guilty by reason of insanity. While the government's medical expert "declined to render an opinion on whether Grigsby can be held criminally responsible for the bank robberies[,]" the defendant's expert offered an opinion, based upon a reasonable psychological certainty, that the defendant suffered from schizophrenia at the time of the bank robberies, making him a candidate for the defense of not guilty by reason of insanity. *Id.* at *4. The Sixth Circuit also found a strong likelihood that Grigsby would be civilly committed under § 4246. The court emphasized that the government's expert testified that, if the defendant was not medicated, he would remain psychotic, and the next logical step would be to consider civil confinement under § 4246. While the government's medical expert testified that the defendant did not pose a present danger to others in the structured confines of the prison hospital, he conceded that the defendant was not "necessarily fit for release into society." *Id.* at *3.

By comparison here, there is *no* evidence that defendant would likely be found not guilty by reason of insanity or that he would qualify for civil commitment under § 4246. In a report dated July 31, 2012, it was noted that, due to defendant's unwillingness to cooperate with the evaluation process, officials at FMC Butner were unable to determine if defendant was insane at the time of the offense. (Doc. No. 53, July 31, 2012 Report at 144.) Consistent with that conclusion, at the April 10, 2013 hearing, Dr. Cochrane explained that the determination of insanity at the time of the alleged crime

still cannot be made. Therefore, Dr. Cochrane stated that he did not (and could not) form an opinion one way or the other on the issue of insanity. Unlike the situation in *Grigsby*, no contrary evidence was provided on this subject.[15]

Likewise, there is no record evidence that would suggest that defendant would likely be subjected to civil commitment. Under § 4246, civil commitment of an individual subject to release by the Bureau of Prisons is appropriate where the individual "is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another . . . ." 18 U.S.C. § 4246(a). The November 16, 2012 Report indicates that defendant did not appear to pose a threat to others within the confines of the facility at FMC Butner, and there was no evidence that he would pose a threat if released into society. Dr. Cochrane explained that civil commitment involves a type of risk assessment that is completely different than the assessment of competency and the need for involuntary medication. It is well settled that the government's interest in prosecuting is not diminished if the likelihood of civil commitment is uncertain. *See United States v. Gutierrez*, 704 F.3d 442, 450 (5th Cir. 2013) (possibility of civil commitment did not diminish the government's important interest where it was unclear whether the defendant

---

[15] The absence of any evidence that defendant would be likely to prevail on an insanity defense or be subject to civil commitment, while such evidence was readily apparent in *Grigsby*, may be explained by the differences in the diagnoses. While Grigsby was diagnosed with schizophrenia, Horton has been diagnosed as suffering from delusional disorder, persecutory type. In the November 16, 2012 Report, Drs. Cochrane and Herbel explained that,

> Unlike individuals with schizophrenia, individuals with delusional disorder usually maintain adequate social functioning apart from the behavioral impact of the delusional belief, which often precludes them from being subjected to civil involuntary psychiatric treatment.

(Doc, No. 64, November 16, 2012 Report at 197.)

would meet the statutory requirements for civil commitment); *Gomes*, 305 F. Supp. 2d at 164-5 (same); *see also Green*, 532 F.3d at 551 (finding that the government's important interest was not diminished where "neither expert indicated that [the defendant] would be a candidate for civil commitment"). Consequently, the competency evaluation is of little assistance in determining the likelihood that a period of civil confinement would serve to diminish the government's important interest. *See Gomes*, 305 F. Supp. 2d at 164-65 ("Although it is almost impossible to predict the outcome of civil commitment proceedings in many cases, here it is especially problematic in that the disorders diagnosed in this case relate specifically to the competency determination and not to his risk of harming other persons or property.")

The facts of the present case are much more in line with those presented to the Fifth Circuit in *Gutierrez*. There, the defendant was charged with making threats against former President George W. Bush and Texas Governor Rick Perry. In granting the government's motion to forcibly medicate, the court found that the defendant was not seen as a danger to himself or others while confined, that he was not severely disabled by his mental illness, and that he had no record of violence in the past. *Guiterrez*, 704 F.3d at 450. The court also found the likelihood that defendant would prevail on an insanity defense was uncertain. *Id.* at 452. Likewise here, there is no evidence suggesting that defendant would be able to prevail on an insanity defense, or would be a candidate for civil commitment under § 4243 or § 4246. Further, the record evidence would not support a finding that defendant is severely disabled by mental illness, and the only evidence of past violence is a twenty year old domestic violence conviction.

The length of pretrial confinement, another special consideration that can serve to vitiate an important governmental interest, gives the Court some pause. When considering a defendant's pretrial detainment, the court in *Grigsby* instructed district courts to consider any sentence the defendant is likely to receive, giving weight to the advisory U.S. Sentencing Guidelines. *See Grigsby*, 2013 WL 1458009, at *9. The government estimates that, if convicted, defendant would likely receive a sentence within the 10-16 month range. (Doc. No. 81, Supplement at 274.) An even shorter sentence would likely flow from a guilty plea.[16] *See Grigsby*, 2013 WL 1458009, at *9. Defendant has already been confined pretrial for over nineteen months, and it is anticipated that any period of restorative treatment with forced medication will take at least an additional four months.[17] In the event that he is tried, convicted and sentenced, defendant would likely have already served all of any sentence he may receive from this Court. While this consideration does serve to diminish the importance of the governmental interest, the Court finds that the government retains a strong interest in prosecuting defendant and has, therefore, proven the first *Sell* factor by clear and convincing evidence. *Compare United States v. Bush*, 585 F.3d 806, 815 (4th Cir. 2009) (pretrial detainment "sufficiently long to cover, or almost cover, any sentence that reasonably could be anticipated . . . alone

---

[16] While defendant has indicated that he would be willing to plead guilty to the charge in the indictment, the Court finds, for the same reasons he is currently not competent to stand trial, he is also not competent to enter a guilty plea. *See United States v. Carpenter*, 25 F. App'x 337, 342 (6th Cir. 2001) ("[T]he competency stand for pleading guilty is identical to that for standing trial, where the inquiry is 'whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'") (quoting *Godinez v. Moran*, 509 U.S. 389, 397 (1993) (further quotation and citation omitted).

[17] The Court notes that part of the delay to date is the result of defendant's unwillingness to cooperate in the evaluation process, and the lengthy period of time his expert took in evaluating defendant. While defendant's obstructive attitude is likely a product of his mental illness, it is unfair to assess the entire amount of the delay to the government or the Court.

16

'does not defeat [the government's interest'"]) (quoting *United States v. Evans*. 585 F.3d at 239); *with Feretti*, 2009 WL 4730227, at *4 (finding the fact that the defendant had already "been incarcerated for a period longer than any likely sentence and approaching the maximum sentence she would likely receive[,]" along with other moderating circumstances, defeated the government's important interest); *see also Sell*, 123 S. Ct. at 2185 ("The possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed)" vitiates, but does not entirely eradicate, the need for prosecution).

The Court acknowledges that there may certainly be circumstances, such as those presented in *Grigsby*, under which a defendant's lengthy pretrial detainment, along with other mitigating circumstances, may serve to preclude the government from satisfying the first *Sell* factor by clear and convincing evidence. However, those circumstances are absent from the record, and other circumstances that can be found in the record strongly counsel in *favor* of finding that the government has met its burden of proving a strong interest in prosecuting this crime. Prosecution of the serious offense of sending threatening messages to a member of the judiciary sends a message of "society's disapproval" of such conduct, and is likely to deter others from such behavior. *See Gutierrez*, 704 F.3d at 451. Moreover, even if defendant is tried and immediately released upon a conviction (assuming that he is not acquitted of the charged offense), he may be subjected to a period of supervised release under 18 U.S.C. § 3583. Such a sentence would ensure that defendant is properly monitored following his release. *See*, *e.g., Gutierrez*, 704 F.3d at 451; *Bush*, 585 F.3d at 815. Such a consideration is even more important where, as here, there is no evidence that a defendant is likely to be subject to

civil commitment. Thus, while there may be mitigating circumstances, the government has an important interest in bringing defendant to trial on the serious charge stated in the indictment and has demonstrated this important interest by clear and convincing evidence.

## 2. Involuntary Medication will "Significantly Further" the Government Interest

One final consideration identified by *Sell* that may lessen the government's important interest in prosecution is the government's "concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one." *Sell*, 539 U.S. at 180; *see Grigsby*, 2013 WL 1458009, at *10. The Sixth Circuit noted that "[t]his aspect of the first *Sell* factor dovetails into the remaining three factors: whether antipsychotic medication is substantially likely to render [the defendant] competent to stand trial and is substantially unlikely to cause side effects that will interfere significantly with his ability to assist defense counsel; whether involuntary medication is necessary to further the government's interest; and whether involuntary medication is medically appropriate for [the defendant]. *Id.* at *11 (citing *Sell*, 539 U.S. at 181).

Involuntary medication significantly furthers the government's interest in bringing a defendant to trial on serious charges if: (1) the administration of drugs is "substantially likely to render the defendant competent to stand trial;" and (2) the drugs are "substantially unlikely to have side effects that would interfere significantly with the defendant's ability to assist counsel in conducting a trial defense . . . ." *Sell*, 539 U.S. 166, 123 S. Ct. at 2185; *see United States v. Bush*, 585 F.3d 806, 815 (4th Cir. 2009); *Green*, 532 F.3d at 552.

18

At the hearing, Dr. Cochrane testified that, consistent with the treatment plan outlined in the November 16, 2012 Report, if the Court ordered forcible medication, health officials would present defendant with the order, and discuss the options. If defendant agreed to comply with the order, defendant would be given an oral dose of risperidone, which has the benefit of staying in the blood stream longer than other drugs, such as haloperidol. However, given defendant's lack of insight into his own medical condition, and his reluctance to participate in any way with restorative treatment, Dr. Cochrane believed it was likely that the medication would have to be forcibly injected. In that case, Dr. Cochrane testified that defendant would be given haloperidol because, unlike risperidone, it can be administered safely in a short-acting dose. If defendant tolerated the short-acting dose, medical officials would proceed with long-acting dosages. He explained that, with any medication, the lowest effective dose would be tried first, and then the dosage would be increased if it was well tolerated and the lowest dosage did not produce the desired results.

Dr. Cochrane testified that he believed that use of psychotropic medication, as outlined in the November 16, 2012 Report, was substantially likely to render defendant competent to stand trial. He offered four reasons for his conclusion. First, he referenced observational studies following the progress of delusional patients treated with psychotropic medications. According to Dr. Cochrane, these studies, which were discussed more completely in the November 16, 2012 Report, suggested a high likelihood that defendant could be restored to competency with the use of such medications. For example, the report references a 2007 study by Drs. Herbel and Stelmach in which 22 individuals with delusional disorder were involuntarily treated with

19

antipsychotic medication for the purpose of restoring competency. According to the study, 17 of the 22 subjects (or 77%) showed improvement to the point of being restored to competency. (*See* November 16, 2012 Report at 204.)

Second, Dr. Cochrane testified that there were a number of case reports in the literature that suggested that patients with delusional disorders may respond favorably to treatment with psychotropic drugs.[18] Third, Dr. Cochrane referenced a "wealth of literature" on related psychotic disorders, such as schizophrenia, and noted that this literature was set out in great detail in the November 16, 2012 Report. For example, the report identifies a 2012 article written by Drs. Cochrane, Herbal, and Reardon chronicling a study that followed 132 inmates suffering from various psychotic disorders, who were treated with psychotropic medications for the purpose of restoring competency. The vast majority of these patients (79%) were sufficiently improved to be restored to competency. With respect to defendant's particular mental illness—delusional disorder— the study found that 11 out of 15 patients (73%) were restored to competency. (*See* November 16, 2012 Report at 204.) It was Dr. Cochrane's opinion that there was no reason to believe that defendant would react any differently than the majority of patients who benefitted from these medications.

---

[18]Given the "relatively rare" nature of delusional disorder, and the fact that most individuals with the disorder are able to function in society in such a way that they do not find themselves involuntarily committed or otherwise taken into custody for violating the law, Dr. Cochrane explained that there have not been any double blind placebo-controlled studies performed on this population. Nonetheless, he testified that observational studies showed patients with delusional disorder to experience marked improvement with treatment, and were probative in the present case. Of course, some courts have lamented over the limited amount of statistical evidence directly related to patients with delusional disorders. In *Bush*, 585 F.3d at 817, the Fourth Circuit expressed concern over what it called the "dearth of medical evidence about the success of medicating persons suffering from Delusional Disorder, Persecutory Type . . . ." Ultimately, however, the court vacated the trial court's order of forced medication and remanded for further consideration because the trial court failed to apply the clearly convincing standard, and failed to take into account the defendant's particular circumstances. *Id.* at 817-18.

Finally, Dr. Cochrane referenced his own experience in the field treating patients with psychotropic drugs. It was his opinion that most patients with psychotic disorders get better with the administration of antipsychotic drugs. Again, Dr. Cochrane added that he had no reason to believe that defendant would not fall within the large percentage of mentally ill patients that show improvement with psychotropic drug therapy.

The Court finds that the government has shown by clear and convincing evidence that the use of psychotropic drugs is substantially likely to render defendant competent to stand trial. Dr. Cochrane's experience, his evaluation of defendant and a review of his medical records, coupled with the medical literature and studies, demonstrate that there is a greater than 70% percent chance that the use of antipsychotic medications will restore defendant to competency. This clearly meets the "substantially likely" standard. *See Green*, 532 F.3d at 553 (favorably citing case that found that a 70% probability of success supports a finding that such treatment is substantially likely to further the government's interest); *Nicklas*, 623 F.3d at 1180 (at least 70% rate of success supported a finding of substantially likely to restore competency); *Gomes*, 305 F. Supp. 2d at 165 (same); *United States v. Feretti*, Civil Action No. 1:08-m-51, 2009 WL 4730227, at *5 (N.D.N.Y. Dec. 2, 2009) ("Generally, involuntary treatments with a 70% probability that competence will be restored suffice to establish a substantial likelihood of success while probabilities less than 50% will not.")

The second prong of the *Sell* test also requires courts to "find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense,

21

thereby rendering the trial unfair." 539 U.S. 166, 123 S. Ct. at 2185. The November 16, 2012 Report outlines the procedure for addressing potential side effects.[19] The report provides for monitoring[20] for possible side effects and, if any do emerge, "Mr. Horton would be offered the lowest effective dose of adjunctive medication to manage these adverse effects." (November 16, 2012 Report at 223.) According to Dr. Cochrane, another possible response to the emergence of side effects may be to reduce the dosage of the medication until a more tolerable level is found.

As to specific side effects, Dr. Cochrane testified that the side effect most likely to interfere with defendant's ability to assist in his defense is sedation, but explained that by starting with the lowest possible dosage and then slowly tapering upward the sedative effect can be minimized or eliminated entirely. (*See* November 16, 2012 Report at 208 ["The side effect of sedation is usually temporary and can be managed with dosage adjustments."].) Other possible side effects include those that are neuromuscular in nature and can involve "sustained contraction of various muscle groups, which may affect muscles of the jaw, back, neck, eyes, and tongue. While dystonic reactions are frightening and painful to the patient, they are easily, effectively

---

[19] The Report also notes that medical officials at FMC Butner have utilized "epocrates online" pharmaceutical software to verify that the proposed antipsychotic medications can be added to defendant's existing medicinal regimen without any drug to drug interactions. The medications that defendant is currently taking were entered into the program, along with the proposed antipsychotic medications, which included risperidone, haloperidol, and a third medication, fluphenazine. According to the November 16, 2012 Report, "[t]here were no contraindication or avoid use warnings listed between Mr. Horton's medication regimen for his multiple medical ailments and any of the three proposed antipsychotic medication treatments. The only recommendations of note were to monitor serum glucose and blood pressure." (November 16, 2012 Report at 218.) The proposed treatment plan developed by FMC Butner provides for such monitoring.

[20] Dr. Cochrane testified that nursing staff is on each unit of the facility 24 hours a day, 7 days a week, and would be continually monitoring for emergence of possible side effects.

22

and quickly treated with anit-cholingeric medication." (November 16, 2012 Report at 209.)[21]

Given defendant's history of cardiac disease, and defendant's subjective concerns that antipsychotic medication would induce a heart attack, Dr. Cochrane testified that he and other health officials at FMC Butner gave consideration to the question of whether there were any potential side effects that might be related to defendant's heart. To explore these possible side effects, health officials at FMC Butner sought a cardiology consultation. As previously mentioned, defendant refused to meet with the cardiologist, but the cardiologist was able to review the results of the testing done to date, as well as the medical records from defendant's personal cardiologist. While the cardiologist recommended that defendant be carefully monitored during the restorative process, he ultimately concluded that such treatment would not be likely to adversely affect defendant's heart. The consultant also recommended that follow-up tests, including EKGs, blood pressure monitoring, QT interval monitoring, and electrolyte analysis, take place. "Overall, the consultant cardiologist concluded that Mr. Horton did not have any major risk of cardiac side effects of the [drugs haloperidol, risperidone or fluphenazine], as long as the QT interval concern was addressed initially and during the course of therapy." (November 16, 2012 Report at 196.)

While serious risks associated with defendant's heart are not likely, they cannot be entirely ruled out. Dr. Cochrane noted that possible serious risks posed by the

---

[21] The report referenced possible metabolic side effects of weight gain, diabetes, and elevated serum lipids. It further noted that, in general, these can be prevented by avoiding the second generation drugs, such as clozapine and olanzepine, neither of which is included in the proposed treatment plan. Also the plan calls for monthly monitoring of weight and measurement of defendant's fasting fingerstick glucose. (November 16, 2012 Report at 210-11.)

psychotropic drugs include sudden death. He explained that sudden death occurs in the general adult population at a rate of 7 per 10,000 individuals (.007%), and occurs at the slightly more frequent rate of 10 to 15 per 10,000 individuals (.010% - .015%) in people who are treated with antipsychotic medication. Dr. Cochrane cautioned that this slight increase in the occurrence of sudden death may not necessarily be attributable to the use of psychotropic drugs, but may be due to unhealthy lifestyle choices, like excessive smoking, that individuals who suffer from psychotic disorders tend to make.

Another rare but serious side effect identified by Dr. Cochrane is neuroleptic malignant syndrome. "The symptoms may include muscular rigidity, dystonia, high fever, increased blood pressure, increased hearth rate, akinesia, mutism, and obtundation." (November 16, 2012 Report at 212.) The report provides that the rate of occurrence varies from .07% to 2% of patients who are administered antipsychotic drugs. (*See id*.) Dr. Cochrane testified, however, that in his experience treating numerous heart patients he had never witnessed the emergence of this or any other life threatening side effect.

In Dr. Cochrane's opinion, there was a 20% percent chance that defendant would experience at least some mild side effects, and that they could be easily managed in the hospital setting. While he did not entirely discount defendant's concern for his heart health, he opined that it was highly unlikely that defendant would experience any serious side effects or that the proposed use of psychotropic drugs would induce a heart attack.

In *Grigsby*, the court gave particular weight to medical evidence that the defendant had between an eighteen and forty percent chance of developing an irreversible

condition known as tardive dyskinesia. 2013 WL 1458009, at *11. Marked by grotesque involuntary movements, this condition could prevent a defendant from maintaining a dignified appearance before a jury. *Id.* at *2. Unlike the case in *Grigsby*, the evidence before this Court would suggest that defendant's likelihood of contracting an irreversible neurological disorder, such as tardive dyskinesia, is relatively small—five percent or less.[22] Further, the November 16, 2012 Report provides that serious neurological side effects, such as tardive dyskinesia, "would be much less likely to emerge during the relatively short period of 120 days" designated for competency restoration, and would still be unlikely if defendant "were treated for an entire year with either a first generation or a second generation antipsychotic medication." (Doc. No. 64 at 210.)

The Court finds that the government has proven by clear and convincing evidence that the use of psychotropic drugs, as outlined in the November 16, 2012 Report, is substantially unlikely to have side effects that would interfere significantly with defendant's health or his ability to assist in his defense. The government has, therefore, established the second *Sell* factor by clear and convincing evidence.

In fact, unlike the situation in *Grigsby*, it is likely that treatment with psychotropic drugs would actually improve defendant's ability to assist in his defense. Dr. Cochrane testified that defendant's current relationship with his counsel is likely to improve once defendant's delusions, which appear to be at the root of his current mistrust

---

[22] The November 16, 2012 Report provides that the rate of tardive dyskinesia "in a cohort treated with first generation antipsychotic agents is approximately 5% yearly in a general population[], " the rate is even less in second generation drugs (2% yearly in a general population).  (Doc. No. 64 at 210) Tardive dystonia is likely to occur in "1% to 2% of individuals receiving long term treatment with first generation anti-psychotic medication[.]" (*Id.*)

25

of counsel, are better managed through treatment.[23] Thus, the record supports a finding that forced medication would improve defendant's communications with his counsel, and his ability to effectively participate in his own defense. *See Green*, 532 F.3d at 553 (noting the likelihood that forced medication would improve the defendant's relationship with his counsel and his ability to participate effectively at trial).

### 3.  Involuntary Medication is Necessary

The third *Sell* factor requires trial courts to "find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Sell*, 539 U.S. 166, 123 S. Ct. at 2185.

Dr. Cochrane testified that other types of treatment would not be effective in restoring defendant to competence. He explained that there is no medical data or literature to support a finding that psychotherapy alone is effective for people who suffer from psychotic disorders. The November 16, 2012 Report further references numerous studies where the "majority of patients with schizophrenia treated with psychotherapy alone remained seriously and chronically ill." (November 16, 2012 Report at 215.) The report explains that individuals, like defendant, with delusional disorders, are especially unlikely to respond to therapy alone. While there is some evidence to suggest that patients who willingly seek such treatment may respond favorably, "there is no evidence a delusional patient like Mr. Horton, who has no insight into his delusions and is being

---

[23] The November 16, 2012 Report also indicates that defendant's delusions have left him largely unable to understand the state of the present criminal case. For example, at one point he advised medical officials that he had already been found guilty of the charges against him, and that he has already served his sentence. (November 16, 2012 Report at 199.) Because these erroneous beliefs are the product of defendant's delusions, Dr. Cochrane testified that the administration of antipsychotic medications will likely serve to better equip defendant to assist in his defense.

held against his will in a correctional facility, would improve after being forced into a psychotherapy process to the extent he would be restored to competency status."[24] (November 16, 2012 Report at 216.) Likewise, in his November 16, 2012 Report, Drs. Cochrane and Herbel opined that, given defendant's delusions and his resistance to any form of treatment for his delusions, he is unlikely to respond to a contempt order issued by the Court. (November 16, 2012 Report at 214.) *See*, *e.g., Gomes*, 305 F. Supp. 2d at 168 (rejecting a contempt order as a less intrusive alternative to forced medication where the defendant had steadfastly refused to take antipsychotic medication under any circumstances).

At the hearing, defendant suggested that he was willing to take the medication Wellbutrin, and offered this as a possible alternative to forced medication with antipsychotic drugs. Dr. Cochrane rejected this as a viable alternative, noting that Wellbutrin is an antidepressant (or mood stabilizer) and is not an antipsychotic medication. It was his opinion that treatment with Wellbutrin would not restore defendant to competency.

Given the nature of defendant's mental illness and his lack of insight into his illness, coupled with his unwillingness to participate in any way in the treatment process, the Court finds that the government has established by clear and convincing evidence that involuntary medication is "necessary" to further the government's interests and that less intrusive means are unlikely to do so.

---

[24] The report concludes that, "[defendant] cannot be engaged in any type of psychotherapy process to attempt to reduce the intensity of his psychotic symptoms because he does not believe that he suffers from any significant symptoms of a major mental disorder. Hence, we offer the opinion that involuntary medication is necessary because alternative, less intrusive treatments are unlikely to achieve substantially the same results of restoring him to competency." (November 16, 2012 Report at 216.)

### 4.   The Administration of Antipsychotic Medication is Medically Appropriate

The fourth prong of the *Sell* test requires trial courts to "conclude that administration of the drugs is *medically appropriate*, i.e., in the patient's best medical interest in light of his medical condition." 539 U.S. 166, 123 S. Ct. at 2185 (emphasis in original). As discussed above, the November 16, 2012 Report references 50 years of studies that demonstrate the effectiveness of antipsychotic medication in treating schizophrenia and related psychotic disorders, and notes that the use of such medications "is considered an essential element in the treatment of these conditions." (November 16, 2012 Report at 216.)

Additionally, and more relevant to the Court's determination of whether involuntary treatment is appropriate for *defendant*, Dr. Cochrane testified that treatment with antipsychotic medication is the appropriate treatment to restore defendant—someone who suffers from delusional disorders—to competency. He reached this opinion after evaluating defendant over a period of several months, reviewing defendant's medical records, and taking into account defendant's pre-existing medical conditions. Both at the hearings and in the November 16, 2012 Report, Dr. Cochrane identified the specific medications that would be used and the reasons for the selection of each drug, the dosages that would be administered, the duration of the treatment period, the possible side effects and the specific plan for evaluating and treating any emerging side effects. The proposed treatment plan was also specifically tailored to address defendant's unique mental and physical concerns. Such an individualized treatment plan clearly meets the requirement that the proposed course of treatment be "medically appropriate." *See Green*, 532 F.3d at 555-556 (citing, with approval, cases from other circuits requiring treatment

28

plans to address the defendant's particularized medical needs). The Court finds, therefore, that the government has established by clear and convincing evidence that administration of the proposed medications is medically appropriate in this case.

**CONCLUSION**

Having considered the *Sell* factors, as they relate to defendant's psychotic disorder and his medical conditions, the Court concludes that it is constitutionally permissible to require defendant to be involuntarily medicated for the purpose of restoring him to competency. Taking into account the efficacy of treatment with antipsychotic medications, the possible side effects and their risks, the lack of any promising alternatives, defendant's pre-existing medical conditions, and the appropriateness of the use of antipsychotic drugs, the Court finds that the government has shown by clear and convincing evidence a need for drug treatment sufficient to overcome defendant's liberty interest in refusing it.

Defendant shall immediately be returned to FMC Butner for treatment for the purpose of restoring defendant to competency. In light of this Court's ruling on the government's motion, this treatment shall include the administration of antipsychotic medications—on an involuntary basis, if necessary, and—as set forth in the proposed treatment plan in the November 16, 2012 Report. The period for restorative treatment will be a reasonable period of time, not to exceed four months from the commencement. The treatment staff at FMC Butner shall be permitted to perform—on an involuntary basis if necessary—any physical and laboratory assessments and monitoring which are clinically indicated to monitor defendant for side effects in the event that defendant refuses to consent to any of the procedures. Medical officials at FMC Butner are also

29

directed to file monthly reports apprising the Court of the progress of the treatments. As soon as defendant is restored to competency, a report shall be filed setting forth the results of the treatment and recommendations for further medical treatment and monitoring during future proceedings in this case.

**IT IS SO ORDERED**.

Dated: April 22, 2013

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**